492 So.2d 498 (1986)
Joseph Scott JACKSON, Jr.
v.
Paul A. LAMBERT, Sr., et ux.
No. CA 84-1238.
Court of Appeal of Louisiana, First Circuit.
May 28, 1986.
Rehearing Denied August 29, 1986.
Writ Denied November 14, 1986.
James E. Toups, Jr., Breazeale, Sachse & Wilson, Baton Rouge, for plaintiff/appellee.
*499 Robert O. Butler, Jr., Kilbourne & Dart, P.O. Drawer, St. Francisville, for defendant/appellant.
Before LOTTINGER, COLE and CRAIN, JJ.
COLE, Judge.
The broad issue presented in this matter is whether a surety who voluntarily paid a debt, without notice to the principal debtor, is entitled to restitution from the debtor for the full amount paid. Resolution of this issue is dependent upon a determination of whether the debtor had any defenses to the payment of the debt, which he could have successfully asserted if given notice. La. Civ.Code art. 3056.
The facts are set forth in the trial court's written reasons for judgment as follows.
"Plaintiff Joseph Scott Jackson filed suit on December 21, 1981 against the Lamberts, alleging that he had guaranteed payment of premiums for one of two life insurance policies issued to the Lamberts, for which financing had been arranged and on which the Lamberts had defaulted. As a result of this failure to pay the premium finance payment due, plaintiff Jackson claims that he was called upon to pay $20,834.58 in premium and interest. He is suing the Lamberts to recover this amount which he paid as guarantor or surety and for attorney fees.
The testimony offered at trial, which spanned several days, indicated varying interpretations by the parties of the very same facts. Plaintiff Jackson is a field underwriter for Mutual of New York (`MONY'), the insurance company which issued the policy in question. Defendants, Paul Lambert and his wife Joyce, were referred to him in 1980 by their casualty insurance agent, Willie Beard, for the purpose of obtaining proposals for life insurance coverage. Mr. Beard first contacted Jackson for the defendants, and entered into a verbal brokerage agreement with him to split any commission that might be earned on a forthcoming policy. The testimony of the parties and witnesses is generally in agreement that thereafter Jackson provided numerous, detailed proposals for policies on the lives of both Mr. and Mrs. Lambert, to provide maximum coverage, with a variety of payment plans for the premiums. Exhibit P-14 offered by the plaintiff in globo consists of a number of computer print-outs of proposals which the plaintiff states that he had put together and presented to the Lamberts over a six to eight month period.
On August 15, 1980, the Lamberts applied to Key Resources, Inc. a subsidiary of MONY, for financing of the premiums on one of the two policies which were eventually purchased, policy No. 10965668 on the life of Mr. Lambert in the amount of 1.5 million dollars. At this time the Lamberts also issued two checks to MONY to bind the policies in the amount of one month's premium: $6,357.25 for Mr. Lambert's policy and $5,001.30 for Mrs. Lambert's policy. Financing was approved by KEY and on or about September 12, 1980, the Lamberts executed a premium finance agreement (P-1) with KEY. It provided that KEY was to advance to MONY each quarterly premium in the amount of $19,529.44 as it became due for the policy on Mr. Lambert's life, and the Lamberts were to repay KEY in monthly installments, beginning November 15, 1980. Plaintiff Jackson signed the agreement in his capacity as field underwriter, and nothing on the document indicates a guarantor or surety status on his part for the Lamberts. It is not essential that guaranty be disclosed but it was not part of the policy or the Premium Finance Agreement. However, by virtue of a Prime Participation Agreement (P-5) between MONY, KEY, and Jackson executed on April 30, 1974, plaintiff claims that he unconditionally guaranteed payment of any unpaid balance on the premium finance agreements, including the ones owed by the Lamberts.
On October 16, 1980, two policies of life insurance, one on each of the defendants, *500 in the amount of 1.5 million dollars each were delivered to the Lamberts. The policies were dated August 15, 1980. The policies provided that the insureds were to have ten days from the date of delivery to examine them and return the policies for a refund of any premium paid with no further liability. Therefore, the Lamberts had through October 26, 1980 to return the policies and avoid liability to KEY or MONY. The policies in question were returned on October 27, 1980, when Mr. Lambert deposited them in the mail, certified and return receipt requested.
In Lambert v. Mutual Life Insurance Co. of New York, 431 So.2d 23 (1st Cir. 1983) the defendants and MONY on the same two policies of life insurance litigated the question of timely return of the policies under the ten day provision. The Court of Appeals reversing Judge Paul B. Landry, Jr. sitting as the trial court held that return of the policies on the eleventh day, where the tenth day after delivery fell on a Sunday, was not timely so as to entitle the Lamberts to return of the whole premium paid on each policy. That decision is deemed to be binding upon this Court. * * *
Although the Lamberts could have backed out of the insurance contracts, and the premium finance agreement as late as October 26, 1980, KEY paid the quarterly premium on Mr. Lambert's policy on October 8,1980, before the policies were even delivered to the Lamberts or the ten day period had begun. On January 30, 1981, KEY began deducting payments from Jackson's escrow account to reimburse itself for the quarterly premium payment it had advanced to MONY, as well as interest. Jackson continued to make payments after his escrow account was exhausted, eventually paying to KEY the total of $20,834.58, for which he is now suing the Lamberts, along with interest and attorneys fees of twenty percent of the amount paid.
There was much testimony to the effect that Mr. Lambert's intention was to purchase two policies of life insurance in the amount of 1.5 million dollars each, at a cost of $5,000.00 per month for thirty-six months for both, or $180,000.00. The defendant testified repeatedly that he was not willing to purchase insurance at a greater cost than this, and that this fact was made known to Jackson when he was drawing up his numerous proposals. His accountant, Norman Neyland, verified this point, also stating that because of Lambert's cash flow, it would have been difficult to make the payments required by this particular policy. Willie Beard, Lambert's casualty insurance agent, also testified that Lambert wished to pay no more than $5,000.00 per month for thirty-six months, and that Jackson was aware of this desire.
Plaintiff Jackson, while never expressly denying knowledge of Lambert's wish to pay $5,000.00 per month, did state he never represented to the Lamberts that the cost for thirty-six months of premiums would not exceed $5,000.00 per month. He and his immediate superior, J. Robert Gibson, manager of MONY's office in Baton Rouge, both testified that it would be impossible for any insurer to provide two policies of life insurance in the amount of 1.5 million dollars each for the figure that Lambert desired to pay. The policy in question on Mr. Lambert's life alone required a total outlay by Lambert of some $303,650.62, far in excess of $180,000.00 for the two policies which Lambert desired. Understandably, it appears that Mr. Jackson was energetic and persistent with the various proposals to sell the policies to the Lamberts.
Robert Gibson, MONY's manager, testified that it was possible to reduce the total cost of a given policy to an insured by taking into consideration such factors as the increasing cash values that a policy reflects with time, as well as dividends earned. He distinguished the terms `gross premium' (amount actually paid by an insured) and `net premium' (amount actually paid by insured less the cash value of the policy over one year and other factors), and eventually concluded *501 that even forty-four years of accounting would not suffice for a layman, namely Norman Neyland, Lambert's accountant, to understand the policy values and program prepared by Jackson for the Lamberts. * * *
The testimony is in agreement that there were numerous meetings between the parties after January, 1980. At a few of these, witnesses were present (Gibson, Neyland, Beard), though the majority were between the Lamberts and Jackson only. At a meeting Jackson arranged and when the Lamberts applied to KEY for premium financing on one of the policies or a time reasonably proximate, a detailed presentation took place involving use of a blackboard by Jackson. After delivery of the policies, Mr. Lambert met with Beard and Neyland to have the policy explained to him at a Baton Rouge restaurant. Lambert stated it was at that time he first discovered the cost of the policy to be over $320,000.00, and not $180,000.00.
The testimony is uncontradicted that Lambert, Neyland, and Beard were to meet the next day, Friday, to see if they understood the policy provisions and cost correctly. This was day `eight' of the ten day period. Instead, Lambert had to leave town to attend an emergency in the operation of his business, and did not return until Sunday, day `ten', when he tried to return the policies.
Three other interesting facts were brought out by the testimony (1) Mr. Jackson, for personal reasons, avoided the Lambert phone calls on October 27, 1980; (2) The Lambert (sic) received no notice of payment by Jackson of the quarterly premiums to KEY: and (3) The check issued to cover payment of one month's premium for Mr. Lambert's policy on August 15 was altered. Exhibit D-5 introduced by the defendants showed that the memo line of each check issued on that date indicated which policy it was to bind. Check number 6813 in the amount of $6,357.35 for Mr. Lambert's policy, # XXXX-XX-XX, was altered by the time of negotiation on the memo line to read `Policy # XXXX-XX-XX,' the number of Mrs. Lambert's policy. (See D-6) Although no evidence established who had done the alteration, since it occurred after the checks were given to MONY's representative on August 15, it must be presumed that the alteration was done by an agent or employee of MONY. * * *"
Following trial the court concluded the Lamberts had made an error regarding the amount of premiums due under the contract which was one of the principal causes of the insurance contract. However, the court also held the Lamberts had access to actual figures at the time the financing agreement was executed, since this document clearly set forth in plain figures the total amount financed and the monthly payments due. In view of these considerations the court concluded:
"In the case at bar, Mr. Lambert's laches and failure to ascertain that which he could ascertain with the help of his accountant caused the MONY policies to become a binding insurance contract from August 15, 1980 to the date of October 27, 1980 when he returned the policies with memos notifying MONY of his intention to cancel.
Thus in spite of error of a principal cause of his contract, Mr. Lambert's actions caused MONY to obligate themselves to provide him and his wife insurance from August 15, 1980 to October 27, 1980 and thus he should not be heard to avoid the obligation for that period."
The court held the Lamberts were liable for the pro rata cost of the premium for the period from August 15 to October 27, 1980, during which coverage under the policy was in effect. After allowing credit for the $6,357.25 check which was originally designated as payment on the policy at issue, the amount found due by the court was $10,836.54. The court also awarded attorney fees, as provided in the financing agreement, in the amount of $2,167.00. Judgment in the stated amounts was rendered in favor of Jackson. Costs were cast equally upon plaintiff and defendants.
*502 The Lamberts have appealed, arguing the trial court erred in holding them liable for any portion of the quarterly premium paid, because the insurance contract they executed with MONY was totally void. Jackson filed an answer to this appeal, arguing the court erred in not awarding him the full amount of the quarterly premium he paid.
We agree with the trial court's conclusion there was a binding contract of insurance between MONY and the Lamberts, although we reach this conclusion for reasons different than the trial court. The facts do not support the conclusion the Lamberts made an error as to the amount of the premiums due under the contract. First, when the contract was confected, the Lamberts gave Jackson a check in the amount of one month's premium ($6,357.25), to bind Mr. Lambert's policy. Accordingly, the Lamberts can not now claim they were unaware of the amount of the monthly premiums due. Further, the premium financing agreement signed by the Lamberts set forth in plain figures the total amount financed to pay the premiums on the policy for thirty-six months, as well as the monthly payments due from the Lamberts under this agreement. A person who signs a written contract is presumed to know its contents and can not avoid his obligations under this contract by claiming he failed to read it. Neldare v. Board of Sup'rs of Southern Univ., 460 So.2d 26 (La.App. 1st Cir.1984).
Lastly, although Mr. Lambert stated repeatedly it was his desire to obtain two life insurance policies in the amount of 1.5 million dollars each at a monthly cost of $5,000 for thirty-six months, he admitted he never saw such a proposal submitted by Mr. Jackson. In view of these facts, we reject appellants' argument there was no binding insurance contract. We affirm the portion of the trial court's judgment holding a binding contract existed.
However, we disagree with the trial court's conclusion the policy was effectively terminated by the Lamberts on October 27, 1980 and premiums were only due by the Lamberts until that date. In reaching this conclusion the court relied primarily on the following factors: 1) the insurance contract contained no language prohibiting the insured from cancelling the contract at anytime desired; 2) a clause in the contract providing for "policy changes" and, 3) the testimony of Willie Beard as to his understanding that the Lamberts could "tailor" or change the contract at any time in any manner. The trial court erred in relying on these factors for the following reasons.
It is true the policy contains no specific provisions on cancellation of the policy by the insured. However, contrary to the trial court's conclusion, the general rule when a life insurance policy is silent as to cancellation is that, in the absence of fraud or misrepresentation, neither party can cancel the policy without the approval of the other party. See Markel v. Travelers Insurance Company, 510 F.2d 1202 (10th Cir.1975); 43 Am.Jur.2d § 415, p. 483. Further, the trial court's reliance on the provision relating to policy changes as authority for the Lambert's right to cancel at anytime was misplaced. This provision provides:
"POLICY CHANGES
This policy may be changed to another form, kind, amount or plan of insurance, subject to approval by the company and to payment of such cost and furnishing of such requirements as it shall consider necessary." (Emphasis added.)
This provision clearly does not give the insured the right to unilaterally cancel the insurance contract at anytime. Changes may be made by the insured under this provision only when the insurer agrees to the change. In the present case, the insurer specifically did not agree to allow the policy to be cancelled by the Lamberts on October 27,1980. Thus, the Lamberts' unilateral attempt to cancel the policy as of October 27th, after the expiration of their ten day free look period, is not authorized by this provision.
*503 We are also not persuaded by the testimony of Willie Beard, the Lamberts' general insurance agent, to the effect the Lamberts had the right to "tailor" or change the contract in any manner they wished at anytime. Beard testified this was his understanding of the agreement between the parties, as well as the insurance policy itself. However, neither the Lamberts nor Jackson made any reference to such an agreement or understanding. Further, we find no provision in the policy conforming to the contentions made by Beard.
From our reading of the policy as a whole, we find it does not give the insured the right to unilaterally cancel until on or after the first policy anniversary, after which the policy may be surrendered at anytime for its cash value. Prior to the first policy anniversary the insured may cancel only with the approval of the insurer. The date approved by MONY as the effective date for the desired cancellation was not October 27th, but the end of the first quarter. Thus, the Lamberts were liable for the entire quarterly premium paid by Key, since the policy remained effective throughout this period.
A surety who has paid the debt of a principal debtor has a right of indemnification from the debtor. La.Civ.Code art. 3052. However, if the surety voluntarily paid the debt without giving notice to the debtor, the surety is not entitled to indemnification from the debtor if the latter had a valid defense to the payment of the debt, which he could have asserted if he had received notice. La.Civ.Code art. 3056. Although Jackson voluntarily paid the full amount advanced by Key without giving notice to the Lamberts, we find no merit to the alleged defense claimed by the Lamberts. Thus, they may not avoid their obligation to reimburse Jackson. La.Civ.Code art. 3052. However, we agree with the trial court's conclusion the Lamberts must receive credit for the amount paid by them to bind Mr. Lambert's policy. It was improper for an employee or agent of MONY to alter the policy designation on Mr. Lambert's check in order to apply it as a payment on Mrs. Lambert's policy. The sum paid was $6,357.25. However, $1,356.31 was refunded to the Lamberts leaving a net credit of $5,000.94. Thus, this amount will be deducted from the $20,834.58 paid by Jackson.[1]
Accordingly, we amend the judgment of the trial court to award Jackson $15,833.64, plus 20% of this amount in attorney fees ($3,166.72), a total of $19,000.36. In all other respects the judgment of the trial court is affirmed. Costs are to be paid by appellants.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] Jackson's remedy for this amount is against KEY, since it received more from Jackson than was due by the Lamberts.